# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **CHERIE LOPEZ-FISHER,** <br><br> Plaintiff, <br><br> v. <br><br> **ABBOTT LABORATORIES,** <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:09cv633 <br><br> **Magistrate Judge Paul M. Warner** |

Before the court is Abbott Laboratories's ("Defendant") motion for summary judgment.[1] A hearing on the motion was held on August 19, 2010. At the hearing, Defendant was represented by Jon E. Klinghoffer and Bentley J. Tolk, and Cherie Lopez-Fisher ("Plaintiff") was represented by David J. Holdsworth. Before the hearing, the court carefully considered the motion, memoranda, and other materials submitted by the parties. After considering the arguments of counsel and taking the motion under advisement, the court renders the following memorandum decision and order.

## BACKGROUND

On August 2, 2007, Plaintiff was hired by Defendant as an Immunology Sales Representative to market the drug Humira to dermatologists across Utah. She was interviewed

---

[1] *See* docket no. 21.

and hired by two women, Krista Wall and Kristen Beckman. Plaintiff was chosen for the Immunology Sales Representative position over a male candidate.

Plaintiff worked with a team of sales representatives, all of whom reported to Ms. Wall and Ms. Beckman. Plaintiff's team was comprised of the following individuals: Rosa Panzarella, Wendall Ito, Jason Sydenham, Brian Barclay, Gennie Hamilton, and Dury Cabell. These individuals are members of, or identify with, the following races and/or ethnicities: Ms. Panzarella is Asian and Caucasian, Mr. Ito is Asian, Mr. Sydenham is Caucasian, Mr. Barclay is Caucasian, Ms. Hamilton is Asian, and Mr. Cabell is African-American.

Each member of the team was a general Immunology Sales Representative, with the exception of Mr. Sydenham and Mr. Ito, who were Strike Representatives. A general Immunology Sales Representative is assigned a specific territory. A Strike Representative splits his or her time between two territories assisting the general Immunology Sales Representatives. Strike Representatives are not compared to general Immunology Sales Representatives with respect to sales performance, but rather are compared to other Strike Representatives throughout the country. Mr. Sydenham was the Strike Representative assigned to Plaintiff's territory. As such, Plaintiff and Mr. Sydenham both called on the same physicians and made some calls together.

Two ways in which a general Immunology Sales Representative's performance is measured are with a Frequency Goal and a Reach Goal. A Frequency Goal measures the number of times a general Immunology Sales Representative visits the doctors in her assigned territory, and a Reach Goal measures the number of times that a general Immunology Sales Representative

2

visits specific doctors who have been identified by Defendant as important market leaders. In the spring of 2008, Plaintiff received her 2007 annual performance review, which covered the time period from her hire date in mid-August to the end of 2007. Her overall rating was categorized as Partially Achieved ("PA"), which is the second lowest out of four possible rating categories. Plaintiff's 2007 annual performance review stated:

> Cherie did not achieve expectations in 2007 in the core job responsibilities such as, clinical & market knowledge & development, selling technique and business management. Cherie received a PA in each of these areas. Cherie did not utilize her resources, such as speaker programs and warchest funds. Next, Cherie did not meet the frequency or reach goals for her high value targets in T3-07. Cherie understands the sense of urgency to comply and exceed expectations.[2]

According to Plaintiff's 2007 annual performance review, Plaintiff should have achieved a Frequency Goal of at least 75% for the third trimester ("T3") of 2007, but she achieved a Frequency Goal of only 50.9%. Plaintiff also should have achieved a Reach Goal of 90%; however, she achieved a Reach Goal of only 66.7%. Because of training time at the beginning of T3 2007, Plaintiff worked for only three of the four months of T3 2007.

In 2007, Plaintiff had an overall sales number of 104%. However, prior to 2008, the sales numbers for Immunology Sales Representatives who marketed Humira were calculated based on the cumulative number of Humira prescriptions written in their territory, including prescriptions written by doctors whom the sales representative called upon and doctors (both dermatologists and rheumatologists) with whom the sales representative had no contact. Plaintiff did not market or sell Humira to rheumatologists. Accordingly, Plaintiff's sales number

---

[2] Docket no. 27, Exhibit 2 at 7.

of 104% was based on the total number of Humira prescriptions written by both dermatologists and rheumatologists practicing within her territory, regardless of whether Plaintiff called on those doctors. Starting January 1, 2008, the sales numbers for general Immunology Sales Representatives who marketed Humira were based only on the prescriptions written by the doctors that the representative called upon. Once Humira prescriptions attributable to doctors whom Plaintiff did not call upon were accounted for, Plaintiff's sales numbers as compared to her peers were reduced. Plaintiff was not aware of this change or that it was the reason for the steep decline in her sales numbers.

In March and April 2008, Defendant ran two sales incentive programs that required a general Immunology Sales Representative to identify ten doctors. The two general Immunology Sales Representatives whose ten doctors had the most improved prescription numbers would be paid a bonus. While Plaintiff was paid a bonus under these two incentive programs, Plaintiff's results did not evidence an overall improvement in Plaintiff's sales numbers. Specifically, for the first trimester ("T1") of 2008, Plaintiff was ranked below all of her teammates with respect to her sales numbers. For T1 2008, Plaintiff was ranked number 30 out of 33 sales representatives for her entire region with respect to her sales numbers. Ms. Panzarella was ranked number 17, Mr. Barclay was ranked number 26, Ms. Hamilton was ranked number 28, and Mr. Cabell was ranked number 29.

As a result of Plaintiff's sales performance issues and other issues regarding her performance of administrative duties, Ms. Wall and Ms. Beckman issued Plaintiff a coaching and counseling letter on or about March 14, 2008. A coaching and counseling letter is a formal

4

step used by Defendant to manage its employees' performance problems. If an employee fails to adequately address the issues raised in the coaching and counseling letter, the employee may be issued a Performance Improvement Plan ("PIP"), which is the final step in Defendant's performance management process.

Plaintiff's coaching and counseling letter stated the following:

1. Timeliness: You are consistently delinquent in your administrative tasks; specifically expense reporting, MAX, monthly reports, business plans, and call reports.
2. Territory Management: You need to increase your frequency and reach in your territory. The goal is 90% reach to high value targets and overall call plan achievement at 80%. This should be reflected in your call plans.
3. Resource Management: You need to better utilize the resources provided to you.
4. Communication: It is important to maintain contact, share knowledge and share successes with your teammates.[3]

Plaintiff's coaching and counseling letter also required her to file expense reports by the Friday of each week, to complete monthly updates on her business plan and return them to Ms. Wall by the last working day of the month, and to submit her weekly routing plan to Ms. Wall by each Sunday at 5:00 p.m. However, Ms. Wall determined that Plaintiff continued to have problems in these administrative areas. For example, on March 26, 2008, Plaintiff was counseled by Ms. Wall regarding Plaintiff's failure to timely return a computer to Defendant's third-party computer vendor. On March 30, 2008, Plaintiff was thirty minutes late delivering her weekly routing plan to Ms. Wall. On March 31, 2008, Plaintiff failed to correctly create and provide Ms. Wall with a baseline assessment as required. On April 25, 2008, Plaintiff was

---

[3] Docket no. 26, Exhibit 4 at 1.

informed that two expense reports that she submitted (one in December 2007 and one in March 2008) were missing information and were sent to Defendant's Financial Compliance Team for further investigation.

On May 22, 2008, Ms. Wall and Ms. Beckman placed Plaintiff on a PIP on the grounds that she failed to adequately address the areas for improvement identified in her coaching and counseling letter. For instance, the PIP stated that Plaintiff's "total attainment for January and February 2008 was 44%," which placed her "last in the country."[4] As a result, Plaintiff was being placed on the PIP for "up to 60 days" for "failure to demonstrate immediate and sustained improvement" in her work performance.[5]

The PIP set forth various areas for improvement for Plaintiff as well as specific expectations. After being placed on the PIP, however, Plaintiff continued to have performance problems. Specifically, the PIP required Plaintiff to have an "overall call plan achievement of 80%."[6] However, as of July 14, 2008, Plaintiff's overall call plan achievement was 42% but, given that ten weeks of the trimester had passed, it should have been at 62%. The PIP further instructed Plaintiff to improve her openers with physicians. However, on June 9, 2008, and June 13, 2008, Ms. Wall informed Plaintiff by email that Plaintiff was not tailoring her sales openings to specific physicians and counseled Plaintiff to use more effective openers. Plaintiff's PIP also required her to submit weekly routing plans to Ms. Wall every Sunday by 5:00 p.m. But, on July

---

[4] Docket no. 26, Exhibit 5 at 1.

[5] *Id.*

[6] *Id.*

16, 2008, Plaintiff again failed to submit her weekly routing plan in a timely manner. The PIP further required Plaintiff to take a test known as the Reveal test on July 20, 2008. Plaintiff took the test but did not pass it. One week after the PIP expired, Ms. Wall and Ms. Beckman, in consultation with Human Resources, recommended Plaintiff's termination for "failure to satisfactorily address the performance issues raised in her PIP."[7]

## STANDARD OF REVIEW

In her complaint, Plaintiff alleges that Defendant violated Title VII of the Civil Rights Act of 1964 by terminating employment on the basis of her gender, race, color, and national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Defendant filed a motion for summary judgment under rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c). "Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *True v. United States*, 190 F.3d 1165, 1171 (10th Cir. 1999) (quotations and citation omitted). Under this standard, "[a] fact is material if under the substantive law it could have an effect on the outcome of the lawsuit." *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotations and citation omitted). "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" *Id.* (alteration in original) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). In reviewing a motion for summary judgment, the court "view[s] the factual record and draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.*

---

[7] Docket no. 23, Exhibit C at 2.

**ANALYSIS**

Title VII enjoins an employer from discharging an employee on the basis of that employee's race, color, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). A plaintiff bringing a Title VII discrimination claim may prove intentional discrimination by direct or circumstantial evidence. *See Sanders v. Sw. Bell Tel., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008). In cases "[w]here, as here, an employee's . . . discrimination claim relies exclusively on circumstantial, rather than direct, evidence, [the court] appl[ies] the burden-shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [(1973)]." *Timmerman v. United States Bank N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

Under the *McDonnell Douglas* analysis, a plaintiff "'bears the initial burden of setting forth a prima facie case of discrimination.'" *Sanders*, 544 F.3d at 1105 (quoting *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)). "After the plaintiff makes a prima facie case, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its employment decision." *Id.* "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual–i.e., unworthy of belief." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). A successful showing of pretext "enables a plaintiff to survive summary judgment." *Timmerman*, 483 F.3d at 1113. But a plaintiff must prove both her prima facie case and pretext by a preponderance of the evidence. *See Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (en banc) (per curiam) (pretext); *Horizon*, 220 F.3d at 1191 (prima facie case).

At the summary judgment stage, while evidence need not be presented in a form that would be admissible at trial, "the content or substance of the evidence must be admissible." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (quotations and citation omitted). Plaintiff "must still identify sufficient evidence requiring submission to the jury." *Turner v. Public Servs. Co. of Colo.*, 563 F.3d 1136, 1142 (10th Cir. 2009) (quotations and citation omitted). "She cannot avoid summary judgment merely by presenting a scintilla of evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor." *Id.*

### A. Prima Facie Case

To demonstrate a prima facie case of discrimination under Title VII, Plaintiff must demonstrate that (1) she belongs to a protected class, (2) her job performance was satisfactory, (3) an adverse employment action was taken against her, and (4) the action was taken under "'circumstances giving rise to an inference of discrimination.'" *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173-74 (10th Cir. 2005) (quoting *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004)). While "[c]ircumstances giving rise to an inference of discrimination. . . . may be . . . satisfied by proof that the employer treated similarly situated employees more favorably, such proof is just one sufficient means to do this and should not itself be mistaken as an indispensable element of the prima facie case." *Id.* at 1173 (quotations and citations omitted). However, in cases of wrongful discharge, the Tenth Circuit has noted that the traditional "similarly situated" prong provides "more structure and guidance" than the "circumstances

which give rise to an inference of unlawful discrimination" prong. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000).

The parties do not dispute that Plaintiff belongs to a protected class or that an adverse employment action was taken against her. Defendant asserts that Plaintiff cannot demonstrate that her job performance was satisfactory or that similarly situated employees were treated more favorably. Conversely, Plaintiff contends that her job performance was satisfactory and that Ms. Wall seized on a few of Plaintiff's early struggles as a new hire because Ms. Wall was romantically interested in Mr. Barclay who feigned a romantic interest in Plaintiff. Thus, Plaintiff alleges, Ms. Wall became angry at Plaintiff and began to treat her more harshly than she treated others. Plaintiff further contends that Ms. Wall subjected her to adverse treatment based on her gender, race, national origin, and color because "other sales representatives were given flexibility in turning in reports or in getting extra guidance on how to perform aspects of their jobs."[8] To support these allegations, Plaintiff cites to various pages of her own deposition. The court will examine each of these deposition excerpts.

First, Plaintiff states that Mr. Sydenham witnessed certain "mistreatment" of Plaintiff by Ms. Wall:

> Q    What mistreatment did he witness?
> A    He called too and asked if she was being nice. He would say he wasn't being held to the same – like she expected me to turn in certain items on time, but he said he'd have a few days to do it.
> Q    Do you know if he was on a performance improvement plan ever?

---

[8] Docket no. 26 at 22.

A   No.[9]

Second, as evidence of the extra guidance other members of Plaintiff's team received that Plaintiff did not, Plaintiff points to the following exchange from her deposition:

> Q   When you talk about having to turn certain documents in and meeting certain deadlines, was that part of your performance improvement plan, the requirement that you do that?
> A   That was part of my coaching plan . . . . But back in October, I remember when I was riding with Brian, he was saying that Krista would let him go for a month of not letting things get done on his computer before she would say anything.
> Q   You do know specifics of what he was talking about?
> A   Entering physicians and expense reports. Entering physicians that we called on and expense reports.
> Q   Do you know if . . . he got his stuff in on time?
>     A   He said that he was just bad at doing it because he wanted to be out there in the field and sell.
> Q   Yeah. But do you know whether he got his information in on time or not?
> A   No. . . .
> Q   Did Jason ever tell you that I didn't get my reports in on time?
> A   He said about entering physician calls and the expense report, he just said it's late.
> Q   Do you know how many times he was late on his expense reports?
> A   I don't.
> Q   Okay. Do you know how many time Brian Barclay was late on any reports?
> A   I don't.
> Q   Do you know how many times Jason Sydenham was late on any reports?
> A   I don't.[10]

Third, as evidence that Defendant treated her disparately on account of her race, national origin, and color, Plaintiff cites to the following exchange from her deposition:

---

[9] Docket no. 27, Exhibit 1 at 39.

[10] Docket no. 27, Exhibit 1 at 40-42.

11

| | |
|---|---|
| Q | Okay. . . . What evidence do you have, as you sit her[e] today, that you were treated differently on account of your race? |
| A | When Kristen Beckman came to ride with me towards the end of my probation plan, she said that she wasn't here to evaluate me, just to observe. And then it was the level of questioning that she got into about my racial background, my religious background, and personal questions about my family. |
| Q | Explain to me exactly the questions that she asked you? |
| A | "So, what is your background? What is your dad? What is your mom? Where are their parents from? What is your relationship like with your dad? What is your" – something – got into my mom's marriage, like how many marriages did she have. My sister, "How was her relationship with her husband?" Things of that nature. "What religion I was." She said she was raised catholic and has been an angel her whole life. . . . [And] my last name change. |
| Q | Okay. |
| A | At that point I felt like I may have been safe to use . . . my maiden name Lopez. And when asking Kirsten how I could do this, she suggested that I just wrote Lopez slash Fisher at the bottom of my e-mail but didn't really recommended [sic] to change anything. |
| Q | Did you ask her why she didn't recommend to change anything? |
| A | No. I remember feeling about bad [sic] it. . . . |
| Q | Besides the questions that Kristen Beckman asked you in that ride-along, do you have any other evidence that you were treated differently on the basis of your race? |
| A | When I was talking to her on phone calls during my probation plan, and we got into discussions about Krista and how I was being treated. And then she went on and asked: "How is she treating Dury? How is she treating Jason? How did she treat Brian? How did she treat Jeannie? How does she treat Rosa? How does she treat Wendall? And I told her everything. I told her the truth. I told her I wanted to see her treat us with more respect, and especially Dury, because he deserved the respect. And I wanted to change – have a positive change within the team and how we were all being treated and communicated to. . . . |
| Q | Besides that conversation that you just testified to . . . and the conversation that you had in the car with Kristen Beckman at the end of your PIP, was there any other evidence that you were being discriminated against because of your race? |
| A | By Kristen Beckman? |
| Q | By anybody? |
| A. | No. . . . |

| | |
|---|---|
| Q | How were you singled out? |
| A | By the way Krista would treat me. . . . It was getting worse. It was progressively getting worse of how she would treat me. And like I said, I felt she just basically – I didn't feel like I was a human being. I felt invisible. I felt discounted. I had no value. Nothing I said mattered or had any – nothing – nothing I could do was right. Nothing I – I didn't bring any value. I just – racism is not always seen but it's felt. . . . |
| Q | I'm asking you specifically about color because you brought a complaint saying you have been treated differently because of your color. So what I'm interested in is what evidence do you have that you have been treated differently because of the color of your skin? |
| A | Everything that we have here. |
| Q | Everything that we have here is not an answer that is going to be able to get us out today. Do you have any specific evidence that you were treated differently because of the color of your skin? |
| A | I guess not.[11] |

After reviewing Plaintiff's deposition testimony in its entirety, the court concludes that it contains insufficient evidence to demonstrate a prima facie case of discrimination. Plaintiff has failed to provide any other evidence, such as deposition testimony or affidavits from other members of her team, to substantiate her claims.

Plaintiff has not demonstrated that she was treated differently from similarly situated employees or that the actions complained of give rise to an inference of discrimination. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1227 (10th Cir. 2000). In the Tenth Circuit, "[a]n employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the same standards governing performance evaluation and discipline." *Id.* at 1232. Two employees who do not share the same performance deficiencies are not similarly situated as a matter of law. *See McGowan v. City of Eufala*, 472 F.3d 736, 745

---

[11] Docket no. 27, Exhibit 1 at 253-59.

(10th Cir. 2006) ("[E]ven employees who are similarly situated must have been disciplined for conduct of comparable seriousness in order for their disparate treatment to be relevant." (quotations and citation omitted)). Plaintiff cannot identify any individual on her team who had the same performance deficiencies that she did but who was treated more favorably. It is undisputed that Plaintiff was the only employee on her team to receive a PA rating for 2007, that her sales performance for T1 2008 was the lowest on her team, and that she received a coaching and counseling letter and a PIP prior to her termination.

> Moreover, in her memorandum in opposition, Plaintiff states the following:
>
> At the onset, it is important to understand what this case is about and what it is not about. [Plaintiff] is alleging that because Mr. Barclay feigned a romantic interest in [Plaintiff] (to divert Ms. Wall's romantic interest in him away from him), Ms. Wall became angry at [Plaintiff] (because she was female) and began to treat her more harshly than she treated others. . . . [Plaintiff] also alleges that independently of the "Barclay" situation, Ms. Wall also treated [Plaintiff] adversely on account of her race, national origin and color.[12]

The only evidence to support this allegation is Plaintiff's own testimony that Ms. Wall looked at her with "hate in her eyes" when Plaintiff sat near Mr. Barclay at the airport.[13] Plaintiff presents no other evidence to support this allegation. However, even assuming this allegation is true, discrimination based on "romantic involvements" are not protected under Title VII. *Taken v. Okla. Corp. Comm'n*, 125 F.3d 1366, 1370 (10th Cir. 1997) ("Favoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification.").

---

[12] Docket no. 26 at 19.

[13] Docket no. 27, Exhibit 1 at 251.

14

Plaintiff also argues that because she was terminated a week after she "successfully passed" the sixty-day time period of the PIP, the court should conclude that this constitutes a circumstance giving rise to an inference of discrimination.[14] The court is not persuaded by this argument, and Plaintiff failed to present any evidence that she "successfully passed" the PIP.[15]

Accordingly, the court has determined that Plaintiff has failed to demonstrate a prima facie case of discrimination. Nonetheless, for the purposes of this memorandum decision and order, the court will address the other two prongs of the *McDonnell Douglas* burden-shifting test.

### B. Defendant's Burden

Even assuming Plaintiff had set forth a prima facie case, the court concludes, and Plaintiff concedes, that Defendant has met its burden. Specifically, Defendant has demonstrated that there were legitimate nondiscriminatory reasons for Plaintiff's termination, namely her performance issues discussed above.

### C. Pretext

The burden now shifts back to Plaintiff to demonstrate that Defendant's issues with Plaintiff's performance were merely a pretext for discrimination. "A plaintiff demonstrates pretext by producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Jaramillo*, 427 F.3d at 1308

---

[14] Docket no. 26 at 23.

[15] *Id.*

(quoting *Morgan*, 108 F.3d at 1323). However, "[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Morgan*, 108 F.3d at 1323 (second alteration in original) (quotations and citation omitted). Pretext is generally demonstrated in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

*Green v. New Mexico*, 420 F.3d 1189, 1193 (10th Cir. 2005) (quotations and citation omitted).

However, in cases where the same person hired and terminated the employee within a relatively short time period, "there is a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Antonio v. Sygma Network, Inc.*, 458 F3d 1177, 1183 (10th Cir. 2006). Plaintiff was hired and fired by Ms. Wall and Ms. Beckman after ten months of employment. Plaintiff, however, argues that "intervening developments may support a reasonable inference that things changed to such a degree as to overcome the same actor defense."[16] Plaintiff contends that those developments are (1) Ms. Wall's alleged jealousy of Mr. Barclay's romantic interest in Plaintiff and (2) Plaintiff's complaint about Ms. Wall to Human Resources. First, as stated above, Ms. Wall's jealousy of Plaintiff is unrelated to her protected classes as a matter of law. Second, the fact that Plaintiff went to Human Resources to complain

---

[16] Docket no. 26 at 23.

about Ms. Wall does not explain why Ms. Wall allegedly discriminated against Plaintiff on the grounds that she is a Hispanic woman. When Ms. Wall hired Plaintiff, she was well aware that Plaintiff is a Hispanic woman.

Furthermore, Plaintiff has not asserted a retaliation claim. Plaintiff has not alleged and has not proffered any evidence that she went to Human Resources to complain that Ms. Wall was discriminating against her, or that she otherwise engaged in any protected activity. Rather, Plaintiff merely states that she went to Human Resources to complain about Ms. Wall. The Tenth Circuit has made it clear that "general complaints about company management and one's own negative performance evaluation will not suffice [to constitute protected activity]" nor does it provide evidence of discrimination. *Hinds v. Sprint/United Mgt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008).

Even assuming Plaintiff had set forth a prima facie case of discrimination, Plaintiff cannot overcome the same actor inference. And Plaintiff cannot demonstrate that the termination of her employment was merely a pretext for discrimination. As such, the court concludes that Plaintiff's claims fail as a matter of law.

## CONCLUSION

Based on the foregoing, Defendant's motion for summary judgment[17] is **GRANTED**. Accordingly, the court dismisses Plaintiff's claims with prejudice and orders each party to bear their own costs.

**IT IS SO ORDERED.**

DATED this 23rd day of September, 2010.

BY THE COURT:

PAUL M. WARNER
United States Magistrate Judge

---

[17] *See* docket no. 21.